# In the United States Court of Federal Claims

No. 19-1228C
(Filed: June 10, 2020)

| | |
|---|---|
| DWAYNE CRAWLEY, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>THE UNITED STATES OF AMERICA, )<br><br>Defendant. )<br> )<br> )<br> ) | Keywords: Breach of Contract; Drug Enforcement Administration; Relocation Pay; 5 C.F.R. § 575.201; 5 C.F.R. § 575.209; Authority |

*Jon D. Brooks*, Brooks LLP, Corpus Christi, TX, for Plaintiffs.

*Miles K. Karson*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Steven J. Gillingham*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Joseph H. Hunt*, Assistant Attorney General. *Kasia M. Preneta*, Civil Litigation Section, Office of Chief Counsel, Drug Enforcement Administration, Springfield, VA, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

Plaintiffs in this case are special agents employed by the Drug Enforcement Agency ("DEA" or "the agency"). Each of them agreed to relocate to DEA offices in Laredo or Matamoros, Mexico. They allege that DEA agreed that—in exchange for their commitment to serve in those locations for three years—it would make relocation incentive payments to them equivalent to 25% of their annual basic pay for each of the three years they served. Plaintiffs contend that—notwithstanding this commitment—DEA provided them with only a single lump-sum payment equivalent to 25% of their basic pay for their first year of service. They also contend that DEA's failure to pay them the equivalent of 25% of their basic pay for all three years of service violated 5 C.F.R. § 575.209. That regulation, which was issued by the Office of Personnel Management ("OPM") pursuant to 5 U.S.C. § 5753, authorizes agencies to pay relocation bonuses to federal employees under specified circumstances. Collectively, Plaintiffs seek $135,311.50 in damages as well as pre- and post-judgment interest, costs, and reasonable attorney's fees.

The government has moved to dismiss Plaintiffs' regulatory violation claims pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), for lack of subject-matter

jurisdiction. It has filed a motion to dismiss plaintiffs' breach of contract claims under RCFC 12(b)(6) or, in the alternative, for summary judgment as to those claims pursuant to RCFC 56. Plaintiffs, in turn, oppose the government's motion to dismiss and have cross-moved for summary judgment as to both their regulatory and contract claims. Oral argument was held on the cross-motions on May 20, 2020.

For the reasons set forth below, the government's motion to dismiss Plaintiffs' regulatory claims is granted. In addition, the government's motion for summary judgment is granted as to Plaintiffs' breach of contract claims and Plaintiffs' cross-motion as to those claims is denied.

## BACKGROUND[1]

### I.     Statutory and Regulatory Framework

Pursuant to 5 U.S.C. § 5753(b), OPM "may authorize the head of an agency to pay a bonus" to a current government employee if that employee's position would be difficult to fill absent such a bonus and requires the employee to relocate to a different geographic area. The payment of the bonus is "contingent upon the employee entering into a written service agreement to complete a period of employment with the agency, not longer than 4 years." Id. § 5753(c)(1). The written service agreement must include "the commencement and termination dates of the required service period . . .[,] the amount of the bonus[,] the method of payment[, and] other terms and conditions under which the bonus is payable." Id. § 5753(c)(2)(A). Any bonus paid pursuant to § 5753 "shall not exceed 25 percent of the annual rate of basic pay of the employee at the beginning of the service period multiplied by the number of years . . . in the required service period of the employee involved." Id. § 5753(d)(1). Whatever the amount of the bonus, it may be paid "as an initial lump sum, in installments, as a final lump sum upon the completion of the full period of service required by the agreement, or in a combination of these forms of payment." Id. § 5753(d)(2).

The requirements of § 5753 are implemented through OPM's regulations at 5 C.F.R. Subpart B. See, e.g., 5 C.F.R. § 575.201 (authorizing an agency to pay a relocation incentive); id. § 575.209 (requiring an authorized agency official to establish criteria for calculating relocation incentives and noting that payment can be made as a lump sum at the beginning of the service term, in installments, as a final lump sum, or any combination thereof). The regulations provide that the head of an agency "retains sole and exclusive discretion, subject only to OPM review and oversight, to . . . [a]pprove a relocation incentive for an employee . . . [and e]stablish the criteria for determining the amount of a relocation incentive." Id. § 575.206(a)(2)–(3). They require agencies interested in providing relocation incentives to establish a plan for doing so. Id. § 575.207(a). The plan must include, among other things, "designation of officials with authority to review and approve payment of relocation incentives," "requirements for determining the amount of a relocation incentive," and "[r]equirements governing service agreements." Id. § 575.207(a)(1), (4), (6). Finally, as relevant to this case, "an authorized agency official who is at least one level higher than the employee's supervisor must review and approve each

---

[1] The facts set forth in this section are drawn from the Plaintiffs' amended complaint and evidence submitted by the parties. Unless otherwise noted, they are not in dispute.

determination to pay a relocation incentive . . . [and that official] must review and approve the relocation incentive determination before the agency pays the incentive to the employee." Id. § 575.207(b)(1).

## II.     DEA's Relocation Incentive Plan

DEA is a component of the Department of Justice ("DOJ"), which delegated to DEA the authority to establish a relocation incentive plan. Under that delegation, DEA may pay eligible employees a maximum bonus of "25 percent of the employee's basic pay . . . at the beginning of the service period, multiplied by the length of his/her service agreement." HR Order DOJ1200.1: Part 2; Compensation: Chapter 2–5(B) (REV), Department of Justice Interim Relocation Incentive Plan, available at https://www.justice.gov/jmd/hr-order-doj12001-part-2-compensation-12.

The DEA, in turn, has issued its own "relocation incentive plan" as required by 5 C.F.R. § 575.207. The plan is set forth in § 2575 of DEA's Manual, which is entitled "Recruitment, Relocation, and Retention Incentives." Def.'s Mot. to Dismiss, or Alternatively, for Summ. J. App. ("Def.'s App.") at 1, ECF No. 8-1. In § 2575.32 of the Manual, DEA explains that the purpose of relocation incentive payments is to "provide[] management greater flexibility in relocating employees with unusually high or unique qualifications or to fulfill a special DEA need when the position is likely to be difficult to fill in the absence of a relocation incentive." Id. at 5. The Manual expressly cautions, however, that "[t]he payment of relocation incentives is discretionary" and that "[n]o applicant or employee is entitled to a relocation incentive." Id.

The DEA Manual identifies the DOJ and DEA officials who are authorized to initiate, review, and approve the payment of relocation incentives, as well as the procedures and criteria for approving such incentives. Id. at 6–7 (DEA Manual §§ 2575.34, 2575.36, 2575.37). It also includes options for how incentives may be paid and requires employees to enter service agreements as a condition of receiving a relocation incentive. Id. at 7 (DEA Manual §§ 2575.39; 2575.4). The Manual provides that such agreements "must specify: [the l]ength of the service period[;] . . . [the e]xact amount of the incentive; [the m]ethod and timing of the payments; [the c]onditions under which the agreement will be terminated by the DEA . . . [; and] DEA or employee obligations, if a service agreement is terminated." Id. (DEA Manual § 2575.4).

## III.    DEA Authorization to Offer Relocation Payments for Specified DEA Offices in Mexico

On October 13, 2009, the DEA's Assistant Administrator for Human Resources signed off on a "decision paper" in which he requested approval to offer incentives to employees who relocate to DEA offices in Ciudad Juarez, Matamoros, Nuevo Laredo, and Tijuana, Mexico. Id. at 14. The Acting Administrator of the DEA approved the request as to all offices on July 15, 2010. Id. at 16. She authorized "the use of relocation incentives of up to 25% of basic pay for employees in [special agent] and [resident agent in charge] positions who sign[ed] a two year service agreement and all other employees who sign[ed] a three year service agreement upon official assignment" to the four resident offices. Id. at 16.

IV.     **The Plaintiffs**

A.      **Dwayne Crawley**

Plaintiff Dwayne Crawley served a tour of duty as a DEA agent in Nuevo Laredo. Pls.'
Resp. to Def.'s Mot. & Pls.' Counter Mot. for Summ. J. ("Pls.' Mot.") Ex. 2, at 1, ECF No. 9-2;
Id. Ex. 7, at 10, ECF No. 9-7.[2] In April 2013, before he was selected for the position, Mr.
Crawley exchanged emails with a DEA Human Resources Specialist. Id. Ex. 6, at 1, ECF
No. 9-6. Although Plaintiffs have not supplied the entire email chain (or any attachments), it
appears that Mr. Crawley was inquiring about his entitlement to a bonus should he receive a job
offer that required him to relocate. The HR Specialist advised him that "you will receive a
payment for each year of your initial tour for the vacancy that you are selected for." Id. "For
example," she explained, "if you are selected for a 3 year tour you will receive it for 3 years but
if you renew your tour there is no provision for you to continue to receive the annual payment."
Id.

The record contains copies of several relocation incentive request and approval forms and
several service agreements related to Mr. Crawley's tour of duty in Mexico. Plaintiffs' Exhibit 1
is a relocation incentive request and approval form that was signed on October 20, 2014 by Rene
Dieguez, the resident agent in charge in the Nuevo Laredo office, as the "recommending
official." Id. Ex. 1, ECF No. 9-1. It proposed that Mr. Crawley's "service agreement period" be
one year in length and last from "10-19-2014 til 10-18-2015." Id. The form, however, does not
bear the signatures of the Assistant Administrator of Human Resources or the Chief Financial
Officer (both of whom are required to approve such requests under § 2575.34 of the DEA
Manual, Def.'s App. at 6); nor does it have the signature of an "approving official," Pls.' Mot.
Ex. 1. It also does not specify the "total amount of the incentive payment," although it
recommends that the "percentage of pay" be 25% and that the payment be made in a lump sum
upon signing. Id.

The government has also supplied a copy of a relocation incentive request and approval
form for Mr. Crawley, which it retrieved from Mr. Crawley's eOPF (electronic personnel folder).
It looks similar to the version of the document at Plaintiff's Exhibit 1, except that there are
several material alterations that appear to have been effected using white-out and ink. The
service agreement period, for example, was altered to read "10-19-2014 til 10-28-2017" Def.'s
App. at 18 (emphasis supplied). In addition, the figure "$18,701.00" is handwritten in ink under
the field for the "total amount of the incentive payment." Id. Under section C, the government-
supplied copy bears the signatures of Raymond Pagliarini, Jr. (the Assistant Administrator of
Human Resources) and the Chief Financial Officer, dated November 19, 2014. There is no
signature by an approving official on the line set forth for that purpose, but handwritten below
the line is a notation stating, in all capital letters, "see attached authorization dated 7/15/10." Id.

The earliest version of a service agreement pertaining to Mr. Crawley is contained at
Plaintiffs' Exhibit 2. Pls.' Mot. Ex. 2. In the field for the "employment term," the box for "one-

---

[2] The page numbers for Plaintiffs' Exhibits refer to the pagination assigned by the Court's
electronic case management system.

year" is checked. Id. at 1. In addition, the form indicates that the commencement date of Mr. Crawley's "required period of service" is October 19, 2014, and its termination date is October 18, 2015. Id. at 1. The form agreement bears Mr. Crawley's signature as well as that of Mr. Dieguez as the "DEA Approving Official" (both dated October 20, 2014). Id. at 2. The agreement specifies that Mr. Crawley will receive an incentive amount of "25% of basic pay of $74,804," with the "total amount of the incentive payment" being "$18,701" to be received as a "lump sum payment upon signing the service agreement." Id. at 1.

As was the case with the relocation incentive request and approval forms, the service agreement that the government retrieved from Mr. Crawley's eOPF appears to be an altered version of the agreement Mr. Crawley has submitted as Plaintiffs' Exhibit 2. See Def.'s App. at 19–20. It bears Mr. Crawley's signature with the date "10/20/2014" in handwriting identical to that on the agreement submitted as Plaintiffs' Exhibit 2. See id. at 20. But in the government's document, Mr. Pagliarini has signed off as the "DEA Approving Official" in place of Mr. Dieguez. Id. His signature is dated November 18, 2014. Id. The field "one-year" is checked for "employment term" as it is in Mr. Crawley's version, but written in ink next to the "other" field under "employment term" is "10-19-14 to 10-28-17." Id. at 19. Similarly, the "termination date of the required period of service" in the government's version of the agreement has been changed to "10-28-2017." Id.

The record also includes an OPM Form 52 whose effective date is November 16, 2014. Id. at 17. It reflects that the agency issued an order directing that Mr. Crawley be provided a payment in the amount of $18,701 around the same time that Mr. Pagliarini signed off on the service agreement contained in Mr. Crawley's eOPF. Id.

The record before the Court also contains a service agreement and a relocation incentive request and approval form proposing a service period from October 19, 2015 to October 18, 2016. See Pls.' Mot. Ex. 7, at 2–4. The service agreement was signed by Mr. Crawley and his supervisor (again, Mr. Rene Dieguez) on or around October 14, 2015. Id. at 3. The accompanying request form is only signed by Mr. Crawley's supervisor and does not include the signatures of the Assistant Administrator, the Chief Financial Officer, or an approving official. Id. at 4. Neither document includes the total amount of the bonus payment or the amount of Mr. Crawley's base salary, though both specify an incentive bonus of 25% to be paid as a lump sum upon signing. Id. at 2–4. Mr. Crawley did not receive a relocation incentive payment for this period. Pls.' 1st Am. Original Compl. ("Am. Compl.") ¶ 10, ECF No. 4.

Also part of Plaintiff's Exhibit 7 is another service agreement and another relocation incentive request and approval form, the latter proposing a service period from November 2, 2016 to November 1, 2018. Pls.' Mot. Ex. 7 at 7–8, 10. The service agreement form bears only Mr. Crawley's signature, however, and is dated August 25, 2017. Id. at 8.[3] The accompanying request form identifies Mr. Crawley's immediate supervisor and recommending official as Peter

---

[3] Other than missing a DEA approving official's signature, this form is complete. It specifies an incentive amount of 25% of a basic pay of $82,042 for a total payment of $20,510.50. Pls.' Mot. Ex. 7, at 7. It also states that the method of payment will be distributed as a lump sum upon signing. Id.

Reilly, but is not signed by Mr. Reilly, or by the Assistant Administrator for Human Resources, the Chief Financial Officer, or an approving official. Id. at 10. Mr. Crawley also did not receive a relocation incentive payment for this period. Am. Compl. ¶ 11.

### B.   Jeffrey Harmon

Plaintiff Jeffrey Harmon relocated to Matamoros, Mexico in August 2014. Pls.' Mot. Ex. 3, ECF No. 9-3. The record contains a service agreement signed by Mr. Harmon and dated on or around August 26, 2014, which is marked as Plaintiffs' Exhibit 3. Id. The service agreement was also signed by Rafael Reyes, an Assistant Regional Director, who is listed as the "DEA Approving Official," and bears the date August 27, 2014. Id. at 2. "Three-years" is checked in the box for employment term to begin on August 24, 2014, but otherwise the form contains many empty fields. Id. at 1. Among them are the percent of basic pay for the bonus, Mr. Harmon's base salary, and the "total amount of the incentive payment." Id.

The government has supplied a copy of Mr. Harmon's service agreement, that it retrieved from his eOPF, which appears to be an altered version of the agreement at Plaintiffs' Exhibit 3. It bears Mr. Harmon's signature with the date August 26, 2014 in handwriting identical to that on the agreement submitted as Plaintiffs' Exhibit 3. Def.'s App. at 24. But in the government's document, Mr. Pagliarini has signed off as the "DEA Approving Official" in place of Mr. Reyes. Id. His signature is dated September 3, 2014. Id. Furthermore, the fields that were incomplete on Mr. Harmon's version are filled out in ink specifying an incentive payment of 25% of basic pay of $99,799 for a total payment of $24,949.75 to be paid as a "lump sum upon signing the service agreement." Id. at 23. A relocation payment of $24,949.75 is reflected in Mr. Harmon's wage and earnings statement for the pay period between September 7 and September 20, 2014. Id. at 26.

Plaintiffs' Exhibit 8 contains several documents related to Mr. Harmon, the first of which appears to be the relocation incentive request and approval form that correlates with Mr. Harmon's service agreement contained at Plaintiffs' Exhibit 3. Pls.' Mot. Ex. 8, at 1, ECF No. 9-8. This request form is signed by Paul K. Craine, a Regional Director, who is listed as the "Recommending Official." Id. It proposes that Mr. Harmon's "service agreement period" be from "08/24/2014–08/23/2017." Id. The form does not bear the signatures of the Assistant Administrator of Human Resources or the Chief Financial Officer (who are required to clear the request); nor does it have the signature of an approving official. Id. It also does not specify the percentage of pay, the total amount of the payment, or the payment schedule. Id.

The government-supplied copy of the relocation incentive request and approval form, that it retrieved from Mr. Harmons's eOPF, consists of the same document that Mr. Harmon supplied with several alterations again accomplished with white-out and ink. Def.'s App. at 22. Under section B of the government's version, missing information is filled in—"25%" is written in for percentage of pay, "lump sum" is written in for the payment schedule, and "$24,949.75" is written as the total amount of the incentive payment. Id. Under section C, the government-supplied copy bears the signatures of Mr. Pagliarini and the Chief Financial Officer, both dated September 3, 2014. Id. There is no signature by an approving official but handwritten below the section set aside for such approval is a notation stating "see attached authorization dated 7/15/10" with "Michele Leonhart" handwritten in ink as the approving official.

A second relocation incentive request and approval form also appears in Plaintiffs' Exhibit 8. See Pls.' Mot. Ex. 8, at 4 (bearing the signature of John D. Niedzialek, who is listed as the "recommending official," dated August 9, 2017). Like Mr. Harmon's previous documents, the payment schedule and the total amount of the incentive payment fields under section B are left blank, but, in this version, the percentage of pay field reads "25%." Id. The service period is listed as "08/24/2014–8/23/2017" (the same service period listed in the documents described above). Id. This version appears to be initialed by Mr. Harmon and Peter A. Reilly (who is listed as an Assistant Regional Director and Mr. Harmon's "immediate supervisor"). Id. at 4–5. It does not, however, include signatures for the Assistant Administrator of Human Resources, the Chief Financial Officer, or an approving official. Id. at 4.

An accompanying service agreement is also included in Plaintiffs' Exhibit 8, which was signed by Mr. Harmon and Peter Reilly on August 7 and 9, 2017 respectively. Id. at 2–3. This agreement does not include the percentage, basic pay, or total amount of the incentive payment. Id. at 2. It only indicates that payment should be distributed as a "lump sum" and lists Mr. Harmon's employment term as "four years," though the term of employment according to the information on the form commenced on August 24, 2014 and ends on August 23, 2017. Id. Mr. Harmon did not receive a relocation incentive payment for any year after 2014. Am. Compl. ¶¶ 10–11.

### C.     Lucy Carter

Plaintiff Lucy Carter began her service in Matamoros, Mexico in August 2013. See Pls.' Mot. Ex. 9, at 1, ECF No. 9-9. Plaintiffs' Exhibit 9 is a copy of a service agreement that bears only her signature (dated August 29, 2013). Id. at 2. In the agreement, her incentive amount is indicated as "25% of basic pay of $78,841.25" with the method of payment described as "[o]ne payment per year at the start of period of service." Id. at 1. Her employment term is listed as "three-years" beginning August 11, 2013. Id.

Ms. Carter also presents what appears to be a completed relocation incentive request and approval form, which is signed by her immediate supervisor, a recommending official, Mr. Pagliarini, and the Chief Financial Officer. Id. at 3. The document indicates that she was to receive 25% of her basic pay for a total amount of $19,710.25. Id. However, the payment schedule reports that she will receive "[o]ne payment per year" for a service period lasting from August 11, 2013 through August 29, 2016. Id.[4] Ms. Carter was apparently paid this incentive payment during her first year of service only. Am. Compl. ¶¶ 9–11.

## V.     The Present Action

Plaintiffs filed their complaint in this court on August 16, 2019. ECF No. 1. They subsequently filed an amended complaint on August 21, 2019 in which they added Ms. Carter as a plaintiff. See Am. Compl. Plaintiffs allege that DEA violated its obligations under 5 C.F.R. § 575.201 and § 575.209, and also committed a breach of contract when it did not provide them

---

[4] The government was unable to locate either a service agreement or an accompanying relocation incentive request and approval form for Ms. Carter.

relocation incentive payments equal to 25% of their basic pay for their second and third years of service. Id. ¶¶ 15, 17–20. They seek judgment in the amount of $40,007 for Mr. Crawley, $55,884 for Mr. Harmon, and $39,420.50 for Ms. Carter. Id. ¶ 25. Each also demands pre- and post-judgment interest, costs, and attorney's fees. Id.

The government filed a motion to dismiss or, in the alternative, for summary judgment on December 16, 2019. ECF No. 8. Plaintiffs responded to the government's motion and cross-moved for summary judgment on January 9, 2020. ECF No. 9. The government responded to the cross-motion on January 23, 2020. ECF No. 10, and oral argument was held on the motions on May 20, 2020.

## DISCUSSION

## I.   The Government's Motion to Dismiss Plaintiffs' Regulatory Claims

Plaintiffs contend that DEA's decision to provide relocation incentive payments equal to 25% of their basic pay for only the first year of their service in Mexico violated 5 C.F.R. § 575.209. That provision, they allege, "clearly provides for up to three years' payments; that is, it states that 'the total amount of relocation incentive payments paid to an employee in a service period may not exceed 25 percent of the annual rate of basic pay of the employee at the beginning of the service period multiplied by the number of years (including fractions of a year) in the service period (not to exceed 4 years).'" Pls.' Mot. at 6 (quoting 5 C.F.R. § 575.209(b)(1)).

As noted above, the government has filed a motion to dismiss Plaintiffs' regulatory violations claims pursuant to RCFC 12(b)(1). When ruling on such a motion, the Court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995)). If jurisdictional facts are challenged, the Court may consider evidence outside the pleadings to determine whether it possesses subject-matter jurisdiction to entertain a plaintiff's claims. Banks v. United States, 741 F.3d 1268, 1277 (Fed. Cir. 2014). For the reasons set forth below, the Court concludes that—as a matter of law—it lacks jurisdiction over Plaintiffs' claims that the agency's failure to provide them with additional relocation incentive payments violated OPM regulations.

The Tucker Act provides that the Court of Federal Claims "shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). It is well established that the Tucker Act—a jurisdictional statute—"does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 398 (1976). Generally, therefore, a plaintiff must identify a separate money-mandating source of substantive rights to establish the Court's jurisdiction. See Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part).

To qualify as money-mandating sources of substantive rights, statutes and regulations "must be such that they 'can fairly be interpreted as mandating compensation by the Federal

Government for the damage sustained.'" Roberts v. United States, 745 F.3d 1158, 1162 (Fed. Cir. 2014) (quoting United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003)). In that regard, "[i]t is enough 'that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages.'" Id. (quoting White Mountain Apache Tribe, 537 U.S. at 473). A statute or regulation "providing for solely discretionary payment of money," however, "does not give rise to 'a right to recover money damages from the United States.'" Id. at 1163 (quoting Adair v. United States, 648 F.2d 1318, 1322 (Ct. Cl. 1981)).

As a general matter, OPM's regulations governing the payment of relocation bonuses are not money mandating because any payment of such bonuses under the regulations is entirely discretionary. See Bell v. United States 145 Fed. Cl. 378, 387 (2019) (holding that the Court of Federal Claims lacked jurisdiction over claims brought pursuant to the regulations set forth at 5 C.F.R. § 575, Subpart B, because those provisions "afford discretion to the government regarding the payment of a relocation incentive"). The regulations (like their authorizing statute) leave it up to agencies to decide whether or not to use relocation bonuses to meet their needs. See 5 C.F.R. § 575.209(a) (stating that "[a]n agency may pay a relocation incentive" (emphasis supplied)); 5 C.F.R. § 575.201 (providing that "[a]n agency may pay a relocation incentive to a current employee who must relocate to accept a position in a different geographic area under the conditions specified in this subpart" (emphasis supplied)).

Further, even assuming that an agency decides to provide an employee with a relocation bonus, the regulations give agencies the discretion to decide the amount of any such bonus so long as it is below the prescribed maximum. See 5 C.F.R. § 575.206(a)(3) (affording agencies authority to establish criteria "for determining the amount of a relocation incentive," subject to the general rule in 5 C.F.R. § 575.209(b)(1) that "the total amount of relocation incentive payments paid to an employee in a service period may not exceed 25 percent of the annual rate of basic pay of the employee at the beginning of the service period multiplied by the number of years (including fractions of a year) in the service period (not to exceed 4 years)"). The agency's discretion to determine the amount of any retention payment under the OPM regulations belies any argument that the OPM regulations, particularly the regulation that Plaintiffs claim DEA violated (i.e., 5 C.F.R. § 575.209(b)(1)), are money-mandating for purposes of establishing this Court's jurisdiction under the Tucker Act.

Plaintiffs' reliance on Doe v. United States, 463 F.3d 1314, 1325 (Fed. Cir. 2006), for a contrary conclusion is unavailing. At issue in that case was whether 5 U.S.C. § 5545(c)(2) is a money-mandating statute. That statutory provision authorizes agencies to elect to provide employees with "administratively uncontrollable overtime" ("AUO") pay (rather than regular overtime pay) where they hold positions that require them to work overtime on an irregular basis that is inherently unsuited to administrative oversight and control. Id. at 1315.[5] It states as follows:

---

[5] AUO pay is not based on the number of actual overtime hours worked in any particular pay period, but is instead based on a percentage of an employee's basic pay. See 5 U.S.C. § 5545(c)(2).

> The head of an agency, with the approval of the Office of Personnel Management, may provide that . . . an employee in a position in which the hours of duty cannot be controlled administratively, and which requires substantial amounts of irregular, unscheduled overtime duty with the employee generally being responsible for recognizing, without supervision, circumstances which require the employee to remain on duty shall receive premium pay for this duty on an annual basis instead of premium pay provided by other provisions of this subchapter.

5 U.S.C. § 5545(c)(2). The court of appeals recognized that "[b]y using the word 'may,' the statute gives the 'head of an agency' the discretion to allow AUO pay for employees in particular positions." Doe, 463 F.3d at 1325. Nonetheless, in Doe the agency had decided to designate certain positions eligible for AUO. The court held that "once the agency makes a determination that a particular position is entitled to AUO pay," § 5545(c)(2) provides that "the employee 'shall' receive premium pay under the statute." Id. The court of appeals found the AUO statute money mandating despite its use of the word "may," "because once a condition is met, namely that the head of an agency states that a position meets the criteria listed in subsection (c)(2), the statute requires payment to employees with that position." Id.

Unlike § 5545(c)(2), there is nothing in the OPM regulations which states that an employee "shall" receive a relocation bonus under any particular circumstances. More to the point here, there is nothing in the regulations that prescribed the amount of any relocation bonus an agency must pay, so long as it stays below the statutory ceiling. Instead, the regulations set forth the conditions under which an agency may, if it wishes, pay an employee a relocation bonus, subject to whatever payment criteria that the agency chooses.

Nor did the regulations become money mandating under the reasoning of Doe once DEA issued its relocation incentive plan. Unlike the DOJ policy in Doe, which identified those positions that the agency head had determined met the criteria for receiving AUO pay, DEA's relocation incentive plan simply establishes the criteria under which the agency may—in its discretion—offer relocation incentives to its employees. See Def.'s App. at 5 (DEA Manual § 2575.32) (stating that "[t]he payment of relocation incentives is discretionary" and that "[n]o applicant or employee is entitled to a relocation incentive"). And the DEA plan, like the OPM regulations and the statute, contemplates that any substantive obligation to pay a relocation bonus shall be based on the terms of the parties' relocation incentive agreement. See 5 U.S.C. § 5753(c)(1); 5 C.F.R. § 575.207(a); HR Order DOJ1200.1: Part 2; Compensation: Chapter 2-5(B) (REV), Department of Justice Interim Relocation Incentive Plan, available at https://www.justice.gov/jmd/hr-order-doj12001-part-2-compensation-12; Def.'s App. at 7 (DEA Manual § 2575.4).

In short, the OPM regulations governing the payment of relocation bonuses are not, at least under the facts of this case, money mandating. This Court therefore lacks jurisdiction under the Tucker Act to hear Plaintiffs' claims regarding their violation. The government's motion to dismiss the claim for lack of subject-matter jurisdiction is therefore granted.[6]

---

[6] The Court notes that—for much the same reason that it lacks jurisdiction to hear Plaintiffs' claims under the OPM regulation—the claims also lack merit. The regulatory language on which

## II.    Breach of Contract Claim

In Count I of their amended complaint, Plaintiffs allege that "valid contract[s]" exist between themselves and the government, that they fully performed under the terms of the contracts, and that the government breached the contracts by not paying them relocation bonuses during their second and third years of service. Am. Compl. ¶ 19. The government has filed a motion to dismiss Court I under RCFC 12(b)(6), or in the alternative for summary judgment as to that claim. Plaintiffs have filed a cross-motion for summary judgment as to their contract claim.

Both parties rely upon evidence outside of the pleadings in supporting their motions and opposing their opponent's. The Court will therefore treat the government's motion as one for summary judgment under RCFC 56. See RCFC 12(d) ("If, on a motion under RCFC 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under RCFC 56."). For the reasons set forth below, the government's motion for summary judgment as to Count I of Plaintiffs' amended complaint is granted, and Plaintiffs' cross-motion is denied.

### A.    Standards for Summary Judgment

In accordance with RCFC 56(a), the Court may grant summary judgment to a party if the movant shows that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In ruling on a motion for summary judgment, all evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party. Id. at 255; Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970).

"Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing Anderson, 477 U.S. at 248); see also Dairyland Power Co-op. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)) (observing that the moving party "may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case"). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue of material fact is in genuine dispute if it "may reasonably be resolved in favor of either party." Id. at 250.

### B.    Application of Standards

To establish the existence of a valid contract with the United States, a plaintiff must prove: 1) mutuality of intent; 2) consideration; 3) lack of ambiguity in offer and acceptance; and

---

they rely plainly does not, as Plaintiffs argue, require agencies to provide bonuses equal to twenty-five percent of their annual rate of basic pay multiplied by the number of years of service. Rather, it states that the relocation bonuses "may not exceed" that amount. 5 C.F.R. § 575.209(b)(1).

4) actual authority on the part of the government's representative to bind the government in contract. Kam-Almaz v. United States, 682 F.3d 1364, 1368 (Fed. Cir. 2012); see also Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003).

The basis for Plaintiffs' contract claims here is somewhat obscure. The Court does not understand Plaintiffs to be arguing that the obligations allegedly breached arose out of written service agreements executed in accordance with the requirements of 5 U.S.C. § 5753, the OPM regulations, and the DEA manual. For one thing, Plaintiffs did not attach any such agreements to their amended complaint, nor specify any provisions of service agreements that were breached, as is required by this court's rules in breach of contract cases. See RCFC 9(k) ("In pleading a claim founded on a contract[], a party must identify the substantive provisions of the contract[] on which the party relies"). Instead, Plaintiffs submitted the service agreements that were in their possession for purposes of discrediting the government's reliance on the agreements that were contained in Mr. Crawley's and Mr. Harmon's eOPFs.[7]

Further, the undisputed facts establish that the "service agreements" that the Plaintiffs filed with the Court in opposing the government's motion are not valid contracts for any number of reasons. For one thing, none of them were executed or approved by authorized agency officials. See H. Landau & Co. v. United States, 886 F.2d 322, 324 (Fed. Cir. 1989) (citing H.F. Allen Orchards v. United States, 749 F.2d 1571, 1575 (Fed. Cir. 1984)) ("To recover for breach of an express or implied-in-fact contract with the United States, [the plaintiff] must show 'that the officer whose conduct is relied upon had actual authority to bind the government in contract.'").

The "service agreement" pertaining to Ms. Carter at Plaintiffs' Exhibit 9, for example, is not signed by any agency official. The same is true for Mr. Crawley's 2017 service agreement contained in Plaintiffs' Exhibit 7. The other purported agreements Plaintiffs submitted that pertain to Mr. Harmon and to Mr. Crawley were signed by their immediate supervisors as "approving officials." But first-line supervisors lack the authority under the DEA Manual to bind the United States in contract. The DEA Manual specifies that it is the Deputy Administrator alone who may enter a binding agreement to provide an employee with a relocation bonus. Def.'s App. at 6 (DEA Manual § 2575.34 ¶ B) ("The Administrator has delegated authority to approve relocation incentives . . . [which] has been redelegated to the Deputy Administrator."). And OPM regulations expressly prohibit an employee's immediate supervisor from authorizing the payment of a relocation incentive bonus in most cases. 5 C.F.R. § 575.207(b)(1) ("[A]n authorized agency official who is at least one level higher than the employee's supervisor must

---

[7] The agreements contained in the eOPFs reflect obligations to pay Mr. Crawley and Mr. Harmon lump-sum relocation payments equal to 25% of their first year's salary. Plaintiffs contend that these agreements are not valid because they were altered after Mr. Crawley and Mr. Harmon signed them. Their suspicions appear well-founded in light of the record before the Court. In any event, the Court gives those documents no weight at all in resolving the parties' cross-motions.

review and approve each determination to pay a relocation incentive, unless there is no official at a higher level in the agency." (emphasis supplied)).[8]

In any case, the terms of the agreements Plaintiffs submitted have been satisfied. Mr. Crawley's service agreement at Plaintiffs' Exhibit 2 indicates that the total amount of his incentive payment is $18,701, which represents "25% of [his salary] of $74,804." Pls.' Mot. Ex. 2, at 1. It is undisputed that Mr. Crawley received this amount in a lump-sum payment. See Def.'s App. at 17 (Crawley eOPF Standard Form 52). As for Ms. Carter, assuming that the relocation incentive request and approval form she supplied accurately reflects the terms of her service agreement it recommends a total payment of "$19,710.25" for a term of service lasting from "08/11/2013 thru 08/20/2016." Pls.' Mot. Ex. 9, at 3. Ms. Carter does not deny that she received that payment.

Mr. Harmon's service agreement at Plaintiffs' Exhibit 3 does not set forth the material terms—such as the amount of the payment—from which the Court could conclude that a contract was made. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 202 (Fed. Cir. 1992) ("In the absence of . . . sufficiently definite terms, no contractual obligations arise."); Restatement (Second) of Contracts § 33 (Am. Law Inst. 1981) (explaining that an offer "cannot be accepted [so as] to form a contract unless the terms of the contract are reasonably certain . . . [that is] they provide a basis for determining the existence of a breach and for giving an appropriate remedy"); see also 5 U.S.C. § 5753(c)(1)–(2) (requiring that an employee enter a service agreement to receive a relocation bonus which includes "the amount of the bonus"). Mr. Harmon's other service agreement at Plaintiffs' Exhibit 8 and Mr. Crawley's 2015 service agreement at Plaintiffs' Exhibit 7 similarly fail to include the total amount of the bonus to be paid.

Lacking valid service agreements to support their claims, Plaintiffs contend that an implied contract was formed between themselves and the DEA based on the DEA's October 13, 2009 "decision paper" approved by the Administrator on July 15, 2010. See Pls.' Mot. at 3. But as explained above, that memorandum merely authorized "the use of relocation incentives of up to 25% of basic pay for employees in [special agent] and [resident agent in charge] positions who sign a three year service agreement upon official assignment to" four Mexico resident offices, including Nuevo Laredo and Matamoros. Def.'s App. at 16. It contained no language in which DEA committed to provide a relocation bonus to any particular employee or class of employees who agree to accept a reassignment to one of those offices. See id. Nor does the memorandum include a commitment that DEA will provide the maximum authorized incentive payment to employees who are offered a relocation bonus. Instead, the memorandum authorized the use of relocation bonuses, "administered in accordance with DEA policy." Id. That policy, in turn,

---

[8] Under the DEA Manual's procedures, the role of the supervisor is only to initiate the bonus approval process. He does so by submitting a request on a standard form to the Assistant Administrator for Human Resources ("HR") and the Chief Financial Officer. Def.'s App. at 6 (DEA Manual § 2575.34 ¶ D). If HR approves payment of the incentive, the Chief Financial Officer "certifies whether or not funds are available and, upon approval by the Deputy Administrator, identifies funds for relocation incentives." Id. (DEA Manual § 2575.34 ¶ F).

emphasizes that the payment of relocation incentives is entirely discretionary and that "[n]o applicant or employee is entitled to a relocation incentive." Id. at 5 (DEA Manual § 2575.32).

Further, DEA policy and the statute and regulations authorizing incentive relocation pay contemplate that commitments to pay relocation bonuses must be made through the execution of a valid service agreement. 5 U.S.C. § 5753(c)(1)–(2) (requiring the service agreement to include: the length of the service period; the exact amount of the incentive; the method and timing of the payments; and any obligations upon termination); 5 C.F.R. § 575.207 (emphasizing that employees must enter a service agreement before receiving a relocation incentive payment); Def.'s App. at 7 (DEA Manual § 2575.4) (same).

Mr. Crawley contends that a contract was formed between himself and DEA as a result of representations made to him in an email from one of DEA's HR representatives. See Pls.' Mot. Ex. 5, ECF No. 9-5; id. Ex. 6. The undisputed facts show that the HR Representative did not possess authority to contract; to the contrary, that authority is—as explained above—reserved to the DEA Administrator and must be exercised through a service agreement. And to the extent that Mr. Crawley's claim is based on a theory of promissory estoppel, such claims may not be brought against the United States. See Twp. of Saddle Brook v. United States, 104 Fed. Cl. 101, 111 (2012) (quoting Jablon v. United States, 657 F.2d 1064, 1070 (9th Cir. 1981)) ("[P]romissory estoppel theory does not fall within the jurisdiction granted to the court by the Tucker Act . . . [because] 'the government has not waived its sovereign immunity with regard to a promissory estoppel cause of action.'").

## III.    Equitable Estoppel

Finally, Plaintiffs contend that the doctrine of equitable (or judicial) estoppel precludes the government from contesting their claims because it agreed to settle another case involving similar claims, namely Cabanvazquez v. United States, Case No. 17-909. See Transfer Compl., Cabanvazquez v. United States, No. 17-909, ¶¶ 16–23 (Fed. Cl. Oct. 16, 2017) (alleging a breach of contract and a violation of 5 C.F.R. § 209). This contention is frivolous.

The doctrine of judicial estoppel provides that "where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1565 (Fed. Cir. 1996) (citing Davis v. Wakelee, 156 U.S. 680, 689 (1895)). "Judicial estoppel is designed to prevent the perversion of the judicial process and, as such, is intended to protect the courts rather than the litigants." Id. Its invocation is discretionary. Id.

Plaintiffs fail to explain how the government's settlement of Cabanvazquez can serve as the predicate for invoking the doctrine of judicial estoppel. Judicial estoppel, as noted, applies where a party urges a position different from one that it successfully urged a court to approve in prior litigation. A settlement obviates the need for a judicial determination and therefore cannot serve as the basis for invoking judicial estoppel. Water Techs. Corp. v. Calco, Ltd., 850 F.2d 660, 666 (Fed. Cir. 1988). Indeed, the settlement agreement in Cabanvazquez contains a standard clause which states that "[t]his agreement is for the purpose of settling this case, and for no other." Pls.' Mot. Ex. 10, at 3, ECF No. 9-10 (settlement agreement in Cabanvazquez). It also states that "this agreement shall not bind the parties, nor shall it be cited or otherwise referred to,

in any proceedings, whether judicial or administrative in nature, in which the parties or counsel for the parties have or may acquire an interest, except as is necessary to effect the terms of this agreement." Id.[9] Plaintiffs' contention that the government should be estopped from contesting the claims here on the basis of its settlement of Cabanvazquez is therefore rejected.

## CONCLUSION

For the foregoing reasons, the government's motion to dismiss Count II for lack of jurisdiction is **GRANTED**. Likewise, the government's motion for summary judgment as to Count I is **GRANTED**. Plaintiffs' cross-motion for summary judgment is **DENIED**. The Clerk is directed to enter judgment accordingly. Each side shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge

---

[9] The Court notes that counsel for Plaintiffs here also represented the plaintiff in Cabanvazquez. Arguably, therefore, he violated the settlement agreement by citing it in this case.